NICHOLS, Circuit Judge.
This case is before the court on appeal from a judgment* of the United States Claims Court in which the trial judge held that an interest-free loan from a closely-held corporation to its majority shareholder and president results in taxable income to this borrower. The trial judge thus refused to follow the well-entrenched principle of tax law that such loans do not result in taxable gain to the borrower. First articulated by the United States Tax Court in Dean v. Commissioner, 35 T.C. 1083 (1961), this principle has since been accepted by five federal courts of appeal (the First, Second, Fourth, Fifth, and Sixth Circuit Courts). In a somewhat different factual context, the Ninth Circuit has also affirmed the holding in Dean. No circuit court has held that such a loan results in a taxable economic benefit. For the reasons set forth below, we decline to deviate from the longstanding precedent against treating such loans as a taxable event, and, consequently, we hold that the taxpayer here did not realize income from the receipt of his interest-free loans. Accordingly, we reverse.
I FACTS
This is a suit under the Internal Revenue laws of the United States seeking refund of income taxes assessed against and collected from appellants, W.L. Hardee and Elnora L. Hardee, husband and wife, for the calendar years 1973 and 1974. Appellants are the principal shareholders of Sea Garden Sales Company, Inc. (“Sea Garden”), a closely-held corporation engaged in several business activities, including marine, industrial, and municipal supplies, farming and ranching, and the operation of a fleet of deep-sea shrimp trawlers. W.L. Hardee, the majority shareholder, was and is the president of Sea Garden and has served as director on the company’s four-member board of directors. He owns approximately 52 percent of Sea Garden’s stock, his wife owns approximately 42 percent, and his daughter and son-in-law own the remainder, roughly 6 percent. Since Elnora L. Hardee appears as a party solely because she filed a joint income tax return with her husband for the years in question, all references to taxpayer or appellant are to W.L. Hardee.
During the calendar years 1973 and 1974, appellant was indebted to Sea Garden, yet he was not obligated to pay, nor did he pay, any interest to Sea Garden on this indebtedness. Appellant’s indebtedness during these years was the result of a company practice dating back to Sea Garden’s inception in the mid-1950’s whereby appellant deferred receipt of his salary until the end of the company’s fiscal year (June 30th) and instead borrowed money, interest-free, from it from time to time. Appellant explained that he instituted this practice in order to enhance the company’s asset posture during the year. Appellant maintained a running account with his company against which any loans would be charged and to which any repayments would be credited. At the end of its fiscal year, Sea Garden would credit appellant’s salary to this account, and appellant would execute a bona fide promissory note (interest-free) for the balance still due the company. While Sea Garden occa *663 sionally made interest-free loans to other corporate employees, these loans were for much • smaller amounts (e.g., $100) than those obtained by appellant.
By the end of 1972, appellant owed Sea Garden approximately $503,000. At the close of 1973, the first year in question, appellant’s indebtedness to Sea Garden increased to about $595,000. The second year at issue ended with appellant owing about $474,000. During this 2-year period, Sea Garden was indebted to the First National Bank of Brownsville, Texas, for monies borrowed from time to time pursuant to a line of credit with the bank. Sea Garden’s indebtedness ranged from $105,000 to $765,-000, and while the loans were unsecured, appellant personally guaranteed them. The record, however, does not disclose the existence of any pattern or substantial connection between Sea Garden’s borrowings from the Brownsville bank and appellant’s own borrowings from Sea Garden, nor does the record enable the court to identify any certain relationship between Sea Garden’s and appellant’s borrowing needs. During 1973 and 1974, appellant also acted as the personal guarantor for more than $347,000 of outstanding indebtedness Sea Garden had incurred with the First National Bank of Harlingen, Texas, to finance the purchase of trawlers used in the company’s shrimp operations, and which indebtedness was secured by collateral in the trawlers purchased with the loan proceeds.
Appellant’s approximate net worth during the period in question was as follows:
December 31, 1972 — $1,198,000
December 31, 1973 — $1,223,000
December 31, 1974 — $1,301,000
Before this period, appellant had invested a substantial amount of money in tax-exempt municipal bonds. By December 31, 1972, appellant held such bonds with a cost basis of about $534,000. By the end of 1973, he increased his holdings to a cost basis of about $600,000, yet by the end of 1974 he had decreased these holdings to about $546,-000.
In reviewing appellant’s tax liability for 1973 and 1974, the Commissioner asserted that as a result of the interest-free loans from his corporation, appellant had realized an economic benefit measured by the interest he would have been required to pay had he obtained the loans in an arm’s-length transaction. Setting the interest rate at 7 percent (a figure appellant does not contest), the Commissioner increased appellant’s gross income accordingly and assessed a deficiency of $24,926.61 for 1973 and $24,-675.02 for 1974. Appellant paid the assessed deficiencies and sued for their recovery. The trial judge concluded that the value of the loans was properly includable in appellant’s gross income for the years in question, but reserved judgment on quantum for later proceedings because the record did not establish the amounts and timing of the off-setting salary payments, and thus did not show the precise value of the loans.
II OPINION
From the inception of our modern income tax laws in 1913 until Dean in 1961, the treasury never took the position that an interest-free loan by a corporation to its shareholder-officers resulted in the realization of income. During this period, the Internal Revenue Code has defined taxable income in broad and sweeping terms, yet the government did not see fit, either in litigation or by rule, regulation, or administrative practice, to treat such loans as a taxable event.
The first break in the government’s stance occurred in Dean, where the Commissioner attempted to tax the value of the taxpayers’ use of over $2 million dollars they borrowed interest-free from the corporation they controlled. The Tax Court held that those taxpayers realized no taxable income attributable to their receipt of the interest-free loans. The Commissioner did not pursue an appeal of this decision, nor did he announce his “nonacquiescence.” For 12 years thereafter, the government reverted to the status quo, making no move to tax such recipients of interest-free loans.
At the end of 1973, after appellant here had completed the first of the two calendar *664 years in question, the Commissioner finally stated his “nonacquiescence” to the 1961 Dean decision. 1973-2 C.B. 4. What then ensued can best be described as a losing campaign by the government in the federal courts to overrule or modify Dean. To date, the five United States courts of appeal considering this issue have rejected the government’s position that interest-free loans by a corporation to its controlling shareholder result in a taxable gain. Parks v. Commissioner, 686 F.2d 408 (6th Cir. 1982); Baker v. Commissioner, 677 F.2d 11 (2d Cir.1982); Beaton v. Commissioner, 664 F.2d 315 (1st Cir.1981); Martin v. Commissioner, 649 F.2d 1133 (5th Cir.1981); Suttle v. Commissioner, 625 F.2d 1127 (4th Cir. 1980). In addition, the Ninth Circuit expressly affirmed Dean in order to hold that a preferential interest rate on a loan given by a lender in consideration for favorable news coverage in the borrower’s newspaper, did not result in the realization of taxable income on the part of the borrower. Commissioner v. Greenspun, 670 F.2d 123 (1982).
In sum, it took the government nearly 50 years before it thought to treat the receipt of an interest-free loan as a taxable event, and over 20 years of case law has since held to the opposite view. In the case at bar, the trial judge recognized the long-standing precedent against the government’s position, yet “with much hesitation” and “reluctance” he rejected the view of Dean and its progeny. Op. at 8. In reversing the decision of the trial judge, we do not disparage his economic analysis of the transaction. Rather, we follow the Dean holding because it represents a well-entrenched interpretation that has logical support. Even if logically assailable, such an interpretation should be changed by Congress, not the courts. In United States v. Byrum, 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972), the Supreme Court stated the approach courts should take when faced with an established principle of tax law:
* * * Courts properly have been reluctant to depart from an interpretation of tax law which has been generally accepted when the departure could have potentially far-reaching consequences. When a principle of tax law requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences. When courts readily undertake such tasks, taxpayers may not rely with assurance on what appear to be established rules lest they be subsequently overturned. Legislative enactments, on the other hand, although not always free from ambiguity, at least afford the taxpayers advance warning.
Of course, the Supreme Court has also warned against a mechanistic, slavish adherence to stare decisis:
We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare de-cisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.
[Helvering v. Hallock, 309 U.S. 106, 119, 60 S.Ct. 444, 451, 84 L.Ed. 604 (1940).]
In the case at bar, however, we are not simply adhering to a recent, questionable decision. The result we reach here is based on years of established precedent and administrative practice, and the transaction involved consists of a type of conduct that has historically not been viewed as resulting in tax consequences. We regard Byrum as controlling when we hold that Congress is better equipped than this or any court to alter the tax consequences of the conduct at issue.
The trial judge failed to give proper deference to the generally accepted interpretation of tax law, espoused by Dean and its progeny, that views the economic benefit a controlling shareholder-officer obtains when procuring an interest-free loan from his corporation as falling outside the definition of taxable income. The trial judge erroneously assumed that the basis for this *665 view lies in the Dean court’s discussion of the different tax treatment accorded the recipient of an interest-free loan and the recipient of in-kind benefits like the free use of an automobile. Although it did distinguish between these two borrowers, the Dean court was simply responding to an argument put forth by the government rather than furnishing the basis of its holding. The Tax Court thus pointed out that had a shareholder-officer paid for the use of a corporate automobile, he would not have received a deduction for this payment, while had the same person paid for the temporary use of corporate money (i.e., had he paid interest on a loan from his corporation), he would have received a deduction for the interest paid. The basis for this different tax treatment, however, is that the definition of taxable income was never intended to encompass the free, temporary use of corporate money hy a majority shareholder-officer.
After rejecting the idea that our tax system would treat the economic benefit arising from the receipt of an interest-free loan differently than the benefit arising from the receipt of other in-kind benefits, the trial judge asserted that the prevailing case law evidently depends on
* * * the notion that, because interest obligations incurred in the marketplace give rise to deductions (in cases where a deduction is allowed) so also then should income-in-kind, when measured by the going rate of interest, carry with it the same tax consequences, to wit: a deduction. * * *
[Op. at 10-11.]
Put in another way, the trial judge stated that the “linchpin” of the prevailing view is “the idea that interest-free borrowings should stand on a parity, economically speaking, with borrowings in the marketplace.” Op. at 7. According to the trial judge, the prevailing view seeks this parity because an interest-free borrower should not meet with tax consequences when he could have retained the same economic benefit while avoiding these consequences had he paid interest on the loan, increased his compensation from his controlled corporation to cover the interest payments, and then deducted the interest he paid.
As we stated above, however, the accepted interpretation of tax law supporting the Dean holding does not depend on the ability of a borrower to have structured a loan transaction in which interest is paid in such a way as to “wash out” his interest payments in order to attain the benefit of a nontaxed, interest-free loan. Rather, the accepted interpretation of the definition of taxable income does not encompass the benefit of such an interest-free loan in the first place. Thus, it is immaterial that no statutory authority exists for imputing a deduction for imputed interest payments, or that no statutory authority authorizes equal treatment for economically equivalent transactions when one of those transactions depends on the ability to deduct interest payments.
Since we hold that the definition of taxable income does not encompass the benefit a majority shareholder-officer gains by the receipt of an interest-free loan from his corporation, the possibility that this transaction would not be economically equivalent to the receipt of an interest-charging loan is beside the point. It was this possibility that prompted the very able Judge Goldberg, in his dissent in Martin, to propose an elaborate tax scheme that would eliminate the disparities that would result if a non-taxed, interest-free borrower could not have completely “washed out” interest payments, had he paid them, with a deduction. The government argues that here such a disparity would occur since appellant supposedly incurred his loans in order to carry tax-exempt municipal bonds; according to the government, had appellant paid interest on these loans, I.R.C. § 265(2) would have prohibited him from deducting these payments. Like the majority in Martin, however, we follow the Dean precedent that the use of funds from an interest-free loan does not constitute a taxable benefit, and therefore there is no need to require the economic equivalence of interest-free and interest-charging loan transactions or to adopt a *666 scheme that accommodates the resulting disparities when such transactions are not economically equivalent. The government’s further extrapolations of the tax consequences of not taxing an interest-free loan because of imputed deductions continue to miss the mark. Since we do not reach our result by imputing to the borrower an interest payment and a corresponding interest deduction, we are not theoretically constrained to impute interest income to the corporation.
This is not to say, therefore, that were we “writing on a clean slate” we would reach the result reached in Dean. Perhaps we would, perhaps not. It is not the situation that confronts us. It is, however, fair to say that we could never go so far as to regard Dean as plainly wrong, in any case. In this regard, it is appropriate to follow the example of the Claims Court judge, and state the objections to the position he contends for. From this it appears that, however full of fallacies the Dean opinion may be, they likewise and to the same degree infect the opposing position.
What is that opposing position? A court must always state the rule of law it relies on in reaching a decision. We let the Claims Court judge speak for himself, as he courageously does:
Undeniably then, the use of a corporate asset without a corresponding obligation to pay is an economic benefit — a gain expressed in money’s worth — the value of which the tax law regards as income. That same result must apply so far as corporate funds are concerned for their use by a shareholder on an interest-free basis is certainly no less an economic enrichment of the borrower than, say, the rent-free use of a company-owned home or boat. * * *
[Op. at 10.]
Thus apparently, as the Claims Court judge states the “tax law,” it makes no difference to what use the shareholder puts the corporate asset. He might (a) use the corporate asset to enhance his standard of living or that of his dependents, or (b) use it to bring in a monetary fruit. The latter possibility is peculiarly applicable to corporate funds, though it might occur if, e.g., the shareholder rented out a company-owned house instead of occupying it. In the event of a shareholder accruing taxable income from the corporate asset, the benefit from the free use would be reflected in and measured by the income received. As the law would tax that income, to tax the benefit also under the above-stated theory would be to tax the same thing twice. Yet the so-called “tax law” does not distinguish between the case stated and use of the corporate asset for personal comfort or to generate tax-exempt income. The “tax law” would not embody any means of avoiding a grossly unfair result.
Another difficulty is that the “tax law” as stated fails to take note of the fact that consideration for a loan of money often is furnished other than by paying interest. As a matter of fact, until recently, checking account depositors normally loaned money interest-free to their banks. They still loan money at much under going interest rates. It was never suggested that banks should pay income taxes on this “benefit,” additional to the taxes they paid on the income earned by loan or investment of their depositor’s funds. While in most cases banks were prohibited by law from paying interest on money deposited in demand accounts, such a proscription does not render this “benefit” (imputed income from interest not being paid) any less real or remove this “benefit” from the ambit of the Claims Court judge’s statement of the “tax law.” One reason for not requiring banks to pay taxes on this' “benefit” no doubt is, when the relationship between the bank and the depositor was at arm’s-length, it could be presumed that the value of services rendered to the depositor, other than interest, equaled what a fair rate of interest to a nondepositor lender would have been. If the depositor was not getting adequate consideration for an interest-free deposit he could take his money elsewhere. The bank did not obtain funds to loan or reinvest without paying any price. Something comparable in principle apparently occurred in *667 the ease at bar. Some part at least of the interest-free loans represented the value of salary earned by the taxpayer, but payment of which he chose to defer. The reason he did this was to make the balance sheet of the corporation look better at the end of its fiscal year. Also, he personally guaranteed the corporation’s debts. In effect, he loaned a portion of his net worth and credit to the corporation in return for loan of some of its cash to him. The “tax law” as stated by the Claims Court judge would textually fail to take this reciprocal benefit into account, although his opinion reveals that he would reduce the loan amount by salary actually due. It seems to remain open just how, on remand, the amount due would be calculated.
While the exaction of interest has in recent years become much more general because of the prevailing high interest rates, it may be noted that until recently a credit retail customer was normally not required to pay interest on an account possibly many months overdue. This might have been considered an interest-free loan that should be taxed. In fact, the tax man looked the other way. No doubt he reasoned that the consumers who did not pay directly for use of money that properly belonged to their creditors, did so indirectly in higher prices for the things they purchased.
The proposition that any benefit-in-kind is income, obviously by its very nature, demands much judicial legislation to flesh it out in practical terms, unless that task is assumed by the legislative branch, or by the executive under proper delegation of legislative authority. The judiciary also has tried to help. Problems still remain, and legislative interventions have been frequent, as e.g., in the areas of employer-furnished meals (I.R.C. § 119; Commissioner v. Kowalski, 434 U.S. 77, 98 S.Ct. 315, 54 L.Ed.2d 252 (1977), or employer assumption of moving expenses when the employee moves from one duty station to another for the employer’s convenience (I.R.C. §§ 82, 217). In the instance of interest-free loans, the authorities cited reflect an absolute judicial balk. The task of fleshing out the principle, if valid, that interest-free loans are a benefit that should be taxed as income, involves the framing of meticulous and carefully balanced rules. The judicial legislation proposed by the United States and to a less extent by the court below, would represent use of a meat axe where the appropriate instrument would be a scalpel. The authorities cited represent a so-far unanimous refusal by the judiciary to grasp the handle tendered, and we decline to break the unanimity.[1]
In conclusion, we hold that appellant’s receipt of interest-free loans from his eorpo- *668 ration does not result in taxable gain. To depart from the long-standing precedent against treating such loans as a taxable benefit would create uncertainty and would result in an uneven application of the tax law. For years people have been structuring their business transactions with respect to the expectation that the receipt of such loans would continue to fall outside the ambit of the I.R.C. § 61 definition of taxable income. With the exception of its stance in the 1961 Dean case, the government waited 60 years before indicating, with the Commissioner’s announcement of his “nonacquiescence” at the end of 1973, that this expectation might not be warranted. Here, appellant had just completed the first of the 2 years in question when this announcement issued. In addition, appellant’s debts to his corporation during these 2 years were the result of a practice he began in the mid-1950’s and continued through the years. As the Second Circuit observed in Baker, Congress appears disinclined, at this point, to extend the reach of § 61 income beyond the point established by case law:
* * * No statutory guidelines have issued since [the 1973 nonacquiescence] to support the Government’s position. Indeed, Congress has instructed the Commissioner not to issue new regulations in the area of fringe benefits until the end of 1983. See Pub.L. No. 95-427, § 1 (1978), extended by Pub.L. No. 96-167 (1979) and by section 801 of the Economic Recovery Tax Act of 1981, Pub.L. No. 97-34 (1981).
[677 F.2d at 12.]
The view that the receipt of interest-free loans is not a taxable event has been followed for such a period of time that it has hardened into a rule of law. Since this view is not grossly erroneous, the fact that counter-arguments can be made will not work to overturn the rule. It is now the prerogative of Congress, not that of the courts, to act on these arguments if it chooses.
REVERSED.

 Pursuant to order of this court dated October 4, 1982, Judge Wiese entered a final judgment on October 8, 1982, corresponding to the decision recommended in the case.

. The able dissents herein say that this case falls outside the Dean rule because the taxpayer incurred his debts to the corporation to carry tax-exempt bonds. This is not the rule stated and followed by the trial judge and would, if adopted, pronounce a limitation on the Dean rule not hitherto espoused by any court, so far as we have learned in our research. The courts invariably have disregarded or declined to reach the question of the effect to be given the taxpayer’s use of the money. The sole exception is the Goldberg dissent, supra, and that did not prevail even with that panel. Nor has any attempt been made to measure what the deduction for supposititious interest would have been, or how closely it would have matched the tax proposed on the imputed income. The trial judge found facts that might have supported a factual conclusion that some parts of the debt were to carry tax exempts, though not all, as other parts were mere anticipations of salary earnings, and as the loans could be viewed as extended, in part, in consideration for taxpayer’s personal guaranty of the corporation’s debts. The trial judge did not himself find that any part was so used. He was writing for the old Court of Claims, whose judges were also fact finders, and might have themselves found the ultimate facts suggested to them by the record. We are not fact finders, being appellate judges. The most we could do, if the dissents were right, would be to remand for findings specifying what part, if any, of the loans by the corporation to Mr. Hardee were made to carry tax-exempt securities within the meaning of I.R.C. § 265(2). The trial judge then should also allow adjustment for any consideration furnished by Mr. Hardee, such as by personally guaranteeing corporate loans from third parties. The dissents face the dilemma that they must either disavow any attempt to measure the actual benefit and how far it was utilized for tax-exempt investments, or else must make elaborate adjustments ending up with a scheme like Judge Goldberg’s.