The TEXAS STATE COMMISSION
FOR THE BLIND and the
State of Texas

v.

The UNITED STATES.

No. 132–83C.

United States Claims Court.

Nov. 26, 1984.

Philip Durst, Austin, Tex., for plaintiff. Jim Mattox, David R. Richards, Mary F. Keller, Lou McCreary, Austin, Tex., and J. Patrick Wiseman, Houston, Tex., of counsel.

Thomas W.B. Porter, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Colonel Kenneth B. Knowles and Charles G. Symmonds, Dallas, Tex., Army and Air Force Exchange Service, of counsel.

## OPINION

MEROW, Judge.

### Introduction

This case comes before the court on cross-motions for summary judgment. Reply briefs have been filed and oral argument has been held.

Plaintiff, Texas State Commission for the Blind (TSCB), seeks enforcement of an arbitration decision holding defendant, the United States, liable for monies unlawfully withheld under the income-sharing provisions of the Randolph-Sheppard Act (Act). 20 U.S.C. §§ 107–107f (1976). Plaintiff claims damages in excess of $10 million. Defendant argues the Act's "military exemption," 20 U.S.C. § 107d–3(d), exempts it from liability.

## Background of the Randolph-Sheppard Act

The Randolph-Sheppard Act, 20 U.S.C. §§ 107–107f, was passed in 1936, Pub.L. No. 732, ch. 638, 49 Stat. 1559. Its purpose was to provide the blind with remunerative employment and greater economic opportunities. Sec. 1, 49 Stat. at 1559. The legislation permitted blind persons licensed under the Act to set up vending stands in federal buildings. No priority or preference was given in approving licenses. H.R. Rep. No. 1094, 74th Cong., 1st Sess. 1, 2 (1936). Rather, the legislation was designed merely to create employment opportunities for the blind on federal property and to further federal rehabilitative efforts on behalf of the blind. *Id.*

In 1954 it appeared the program was not as effective as it might be, in large measure, because of competition from the new technological advance and rapid proliferation of vending machines. 100 Cong.Rec. 9895 (statement of Sen. Gore), 9940 (statement of Rep. Barden), 9949 (statement of Rep. Rhodes) (1954). Congress strengthened the program by passing the Randolph-Sheppard Act Amendments of 1954. Sec. 4(a), Pub.L. No. 83–565, ch. 655, 68 Stat. 652, 663–65. The amendments authorized a preference, where feasible, allowing blind vendors to set up vending stands on federal property. *Id.* This preference was assured by assigning vending machine income to the blind. *Id.* Blind vendors would receive all income from vending machines which were in direct competition.[1]

In 1969 additional amendments were proposed. The legislation was introduced because of the weak showing in the number of blind vendors operating on federal property,[2] the growing trend toward installation of vending machines and the exclusive use of machines in some federal buildings, as well as increasing use of vending machine income by federal employees for recreation and welfare purposes. S. 2461 was designed to protect the blind preference established in the 1954 amendments. S.Rep. No. 1235, 91st Cong., 2d Sess. 2 (1970). The bill provided for exclusive assignment of vending machine income to the blind (or to the state licensing agencies administering the Randolph-Sheppard Act). There were no exemptions for any agency or vending machine. The exclusive income assignment was implemented to facilitate the purpose of the Act, to provide maximum new job opportunities for the blind. *Id.*[3]

In August 1972 Congress requested the General Accounting Office (GAO) to review vending operations on federally-controlled property and to determine if blind vendors were receiving a preference as required by the 1954 amendments. The report[4] included a specific investigation of property under the control of the Department of Defense (DOD), the United States Postal Service (USPS), and the General Services Administration (GSA). It was a major catalyst for enacting the 1974 amendments. S.Rep. No. 937, 93rd Cong., 2d Sess. 9 (1974), S.Rep. No. 1297, 93rd Cong., 2d

---

1. The Secretary of Health, Education and Welfare (HEW) was charged with authority to issue regulations necessary for the operation of the program. 68 Stat. at 663. The implementing regulation provided "for the assignment to the [blind] operator of the income from vending machines within reasonable proximity to and in direct competition with the vending stand. (If a vending machine vends articles of a type authorized by the [blind vendor's] permit and is so located that it attracts customers who would otherwise patronize the vending stand, such machine shall be considered to be in reasonable proximity to and in direct competition with the stand.)" 45 C.F.R. § 403.6(c) (1957).

2. A comparison of blind vending stands on federal and nonfederal installations shows that in

fiscal year 1969 there were 836 stands on federal property employing 972 blind persons and that there were 1084 stands on nonfederal property employing 2287 persons. S.Rep. No. 1235, 91st Cong., 2d Sess. 2 (1970).

3. S. 2461 passed the Senate on September 28, 1970, 116 Cong.Rec. 33936 (1970), but was returned to the Committee on Education and Welfare on September 29, 1970. 116 Cong.Rec. 34241 (1970).

4. "Review of Vending Operations On Federally Controlled Property," Report to the Senate Subcommittee on the Handicapped, Committee on Labor and Public Welfare, B–176886 (Sept. 27, 1973) (hereinafter "GAO Report").

Sess., *reprinted in* 1974 U.S.Code Cong. & Ad.News 6373, 6397.

The report concluded that the program was languishing at the federal level while flourishing at the state level and in the private sector. GAO found that not only had little attention been paid to the blind vendor program, but that major abuses had occurred.[5] GAO concluded that, insofar as DOD compliance was concerned, military officials had not been "receptive" to establishing blind vendor stands.[6] In addition, GAO found that DOD regulations implementing the Act provided that no permits would be granted to blind vendors for the operation of vending stands if morale and welfare programs would be placed in jeopardy. These programs were funded by vending machine revenues. 32 C.F.R. § 260.4(b)(3)(ii) (1966).[7]

The 1974 legislation created a "priority" for blind vendors in establishing and operating vending facilities on federally-controlled property. 20 U.S.C. § 107(b). This priority included a "prior right" to do business once the vending facility had been established. S.Rep. No. 937, *supra*, at 15. In addition, the committee stated that the legislation is directed toward the establishment and protection of blind vending opportunities. *Id.*

Absent from the 1974 legislation was the exclusive assignment of vending machine income to blind vendors provision present in the 1969 bill, S. 2461, *supra.* In its place an income-sharing formula was established. A blind vendor or state licensing agency would share 100 percent of the income of vending machines directly in competition with the blind vending facility, or a 50 or 30 percent share of vending machines not in direct competition with the blind vending facility. Sec. 107d–3(b)(1). In addition, unlike S. 2461 proposed in 1969, the 1974 Act had three exemptions from the income-sharing requirements.[8] The first exemption, the "military exemption," is at issue in this case.

The 1974 Act also contained a new provision providing for arbitration if a complaint was filed with the Secretary of HEW [9] by a blind licensee, or by a state licensing agency, 20 U.S.C. § 107d–1, 34 C.F.R. § 395.-13(a) (1982), 34 C.F.R. § 395.37(a) (1982). An arbitration panel would be comprised of three members. The statute provided one panel member to be designated by each party and the third member to be jointly chosen. 20 U.S.C. §§ 107d–2(b). The arbitration is conducted as a formal hearing. *Id.* § 107d–2(a). The panel's decision is final and binding on the parties, subject to

---

**5.** For instance, the parent Defense Department association at a major federal space installation demanded blind vendors give a portion of their income to the association. This was precisely the reverse of the 1954 amendment requirements. S.Rep. No. 937, 93rd Cong., 2d Sess. 10 (1974). In another instance, federal employees boycotted a blind vendor because he made modest price increases on some items to meet rising costs. *Id.* at 10–11.

**6.** GAO visited six major military installations and the Pentagon. There were 5,984 vending machines on the installations, all of which were operated by nonblind vendors. Of 56 stands, four were operated by the blind. *GAO Report,* at 25. The four blind vendors had individual incomes ranging from $4,000 to $16,000 and received no income from competing machines as required by 45 C.F.R. § 403.6(c) (1957). *Id.* at 27.

**7.** DOD regulations provided for income sharing only if there was "unreasonable" or "unfair" competition from vending machines operated by nonblind vendors. 32 C.F.R. § 260.4(c);

*GAO Report* at 26. This resulted in few blind vendor stands on DOD property. In fiscal year 1972 only 46 of 878 stands on federal property were located on DOD property. *Id.* at 27.

**8.** The Act states that the income-sharing provisions "shall not apply to income from vending machines within retail sales outlets under the control of exchange or ships' stores systems authorized by Title 10, or to income from vending machines operated by the Veterans Canteen Service, or to income from vending machines not in direct competition with a blind vending facility at individual locations, installations, or facilities on Federal property the total of which at such individual locations, installations, or facilities does not exceed $3,000 annually." 20 U.S.C. § 107d–3(d).

**9.** All duties of the Secretary of HEW under the Randolph-Sheppard Act were transferred to the Secretary of Education. Pub.L. No. 96–88, Title VI, Oct. 17, 1979, 93 Stat. 696.

judicial review under chapter 7 of the Administrative Procedures Act (APA), 5 U.S.C. § 701; 34 C.F.R. §§ 395.13(c), 395.-37(b) (1982).

## Factual Background

Plaintiff, Texas State Commission for the Blind, a state licensing agency, 20 U.S.C. § 107b, filed a complaint with the Secretary of HEW alleging DOD failed to comply with the income-sharing provisions of the Randolph-Sheppard Act. Pursuant to 20 U.S.C. § 107d–2, an arbitration panel was convened by the HEW Secretary on January 29, 1981. The dispute stems from differing interpretations of the military exemption, 20 U.S.C. § 107d–3(d). This exemption states that the income-sharing provisions "shall not apply to income from vending machines within retail sales outlets under the control of exchange or ships' stores systems authorized by Title 10." In its implementing regulations, 32 C.F.R. §§ 260.1–260.6 (1982), DOD broadly construed the exemption as applying to "income from vending machines operated by or for the military exchanges or ships' stores systems." 32 C.F.R. § 260.3(D)(3)(i) (1982). The Secretary of HEW, who is charged with the authority to carry out the provisions of the Act, 20 U.S.C. § 107a, and with the responsibility to assure compliance with the income-sharing provisions, 20 U.S.C. § 107d–3(g), interpreted the exemption as excluding "income from vending machines within operated retail sales outlets under the control of post exchange or ships' stores systems authorized under Title 10 of the U.S.C." 34 C.F.R. § 395.32(i) (1982).

At the arbitration proceeding, plaintiff argued in favor of HEW's interpretation of the exemption. Plaintiff contended since HEW is charged with implementing the Randolph-Sheppard Act, its interpretation of the exemption should be given great deference. Plaintiff also argued that the plain reading of the statute favors a narrow interpretation. Plaintiff contended that defendant's interpretation would provide a blanket DOD exclusion from the Act. TSCB also argued that the legislative history on which DOD relied was ambiguous and unreliable evidence of congressional intent. Plaintiff also contended that DOD's unsuccessful attempts to obtain new legislation endorsing its interpretation of the exemption is strong evidence that DOD's interpretation is inconsistent with the purpose of the existing legislation. Finally, plaintiff contended that any overlap of the military exemption with the $3,000 exemption, 20 U.S.C. § 107d–3(d), should be discounted.

Defendant argued that the military exemption is ambiguous and that the legislative history should be consulted. Defendant relied primarily on the Brademas-Sikes colloquy [10] and Senate Report No. 937, *su-*

10. "Mr. SIKES. Mr. Speaker, first let me congratulate my distinguished friend, the gentleman from Indiana (Mr. Brademas), and his committee for an important legislative accomplishment. This is a good bill and a needed bill.

"Mr. Speaker, I do seek clarification on one point. I have discussed this with the distinguished gentleman, and let me ask a question.

"In section 7(d) of the amended act (section 206 of H.R. 14225), there is a statement that the income-sharing provisions as they pertain to vending machines 'within the retail sales outlets under the control of exchange or ship's store's systems authorized by title 10,' shall not apply. I would presume, and I would like the distinguished subcommittee chairman to verify for the record, that this provision exempts from the revenue-sharing plan all those vending machines which are operated by the military post exchanges, Navy exchanges, officer and enlisted messes, and so forth.

"As you are aware, the profits from these vending machines are utilized by the services to finance such worthwhile endeavors as the base libraries, the youth activities, the gymnasium, and other sports activities, hobby shorts and motion picture programs, ashore and afloat. The servicemen finance these programs themselves through the revenues collected in the retail sales outlet systems as I have mentioned. To require that these revenues be shared might well necessitate the appropriation of additional funds for the defense budget. Since work in the fiscal year 1975 defense appropriations bill has been completed, the effect would be to cut off these needed programs without support.

"Would the gentleman confirm for me the fact that it is the intent that this paragraph shall not apply to the military services, and that this is in keeping with the language on page 24 of the Senate report (S.Rep. No. 93–937) which is

*pra.*[11] DOD contended that the military exemption includes vending machines other than those within retail sales outlets because the $3,000 exemption is sufficient to exempt the latter. Defendant argued that if only the machines within the retail sales outlets were exempt, Congress would have created a meaningless exemption. Lastly, DOD maintained that the income-sharing provisions were directed at vending machine competition from civilian employee groups rather than at military personnel.

The arbitration panel reviewed the legislative history of the Act and issued its decision on September 2, 1981. A majority concluded that the military exemption applies only to vending machines actually inside the four walls of retail stores. The panel reasoned that since Congress unquestionably intended the Act to greatly enhance economic opportunities for the blind, the exceptions must be read narrowly. The panel directed DOD to reimburse plaintiff for all income due since the effective date of the 1974 amendments. Plaintiff estimates this sum to be in excess of $10 million.

Plaintiff commenced this action to enforce the arbitration award. Defendant argues the arbitration decision is invalid as a matter of law and seeks judicial review of the decision. Plaintiff argues that since review of the award is controlled by chapter 7 of the Administrative Procedures Act, 5 U.S.C. §§ 701–06, defendant cannot challenge the award. In addition, an array of jurisdictional issues have been raised. These include the basis for the court's jurisdiction, the accrual of the statute of limitations, the proper scope of review of the arbitration decision and whether the nonappropriated fund doctrine deprives the court of jurisdiction.

For the reasons stated below, it is concluded that this court has jurisdiction to determine the validity of the monetary arbitration award and that the arbitration panel correctly interpreted the Act.

### Discussion

#### Jurisdiction

Jurisdiction over the claim is based on 28 U.S.C. § 1491. The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1975). The Act merely confers jurisdiction whenever the substantive right exists. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980). Plaintiff's claim for money damages must be based on another statute. In this case, plaintiff's right is based on 20 U.S.C. §§ 107d–1 and 107d–2(b) requiring the implementation of the arbitration award obtained on its monetary claim. As such, the statute of limitations commences to run from the date of the arbitration decision. *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981).

Had plaintiff chosen not to arbitrate,[12] it could then have instituted a suit for money

---

more specific on this issue tha[n] is the conference report?

"Mr. BRADEMAS. Mr. Speaker, I thank the gentleman from Florida for his fine remarks about this legislation. I am pleased to tell the gentleman that the answer to both his questions is 'Yes.'" 120 Cong.Rec. 35712 (Oct. 16, 1974).

**11.** The pertinent section of Senate Report 93–937 reads as follows:

"Subsection (d) exempts certain activities from vending machine income assignment. Both military exchange systems and the Veterans Canteen Service operate under specific statutory authority, and are thus, as a matter of policy, excluded." S.Rep. No. 937, 93rd Cong., 2d Sess. 24 (1974).

**12.** Arbitration under the Randolph-Sheppard Act is voluntary. 20 U.S.C. § 107d–1 provides:

"(a) Any blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program *may* submit to a state licensing agency a request for a full evidentiary hearing, which *shall* be provided by such agency in accordance with Section 107b(6) of this title * * *.

"(b) Whenever any state licensing agency determines that any department * * * is failing to comply with the provisions of this chapter or any regulations thereunder * * * such licensing agency *may* file a complaint with the Secretary who *shall* convene a panel to arbitrate." (Emphasis added.)

wrongfully withheld pursuant to 20 U.S.C. § 107d–3. The court would have jurisdiction over such a claim. *See Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605, 372 F.2d 1002, 1007 (1967). Under these circumstances the statute of limitations would then have commenced to run within a reasonable time after the statutory payment obligation arose. *See Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847 (1966).

■ However, because plaintiff did elect arbitration and suit was filed within six years of the arbitration decision, the statute of limitations does not bar enforcement of this decision despite the fact that the sums involved commenced to accrue as early as 1974.

Plaintiff argues defendant is precluded by the APA from attacking the arbitration decision. 20 U.S.C. § 107d–2(a) provides the arbitration decision "shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title

*See also* 34 C.F.R. § 395.13(a) (1982); 34 C.F.R. § 395.37(a) (1982). In comparing the permissive language allowing an arbitration request with the mandatory language requiring arbitration only after such a request, it becomes clear arbitration is not mandatory. *See Oklahoma v. Weinberger,* 582 F.Supp. 293 (W.D.Okla.1982), *aff'd,* 741 F.2d 290 (10th Cir.1983); *contra Fillinger v. Cleveland Society for the Blind,* 587 F.2d 336, 337 (6th Cir.1978); *Mass. Elected Committee of Blind Vendors v. Matava,* 482 F.Supp. 1186 (D.Mass.1980); *Texas State Commission for the Blind,* Civil No. A–84–CA 214 (W.D.Tex., Sept. 28, 1984).
The decision in *Oklahoma* supports this result. The court implied that the blind licensee · or agency has a choice whether to arbitrate or to seek judicial relief directly. The court stated:
"The Randolph-Sheppard Act provides for arbitration of a state licensing agency's complaint regarding a federal department or agency's failure to comply with the provisions of the act or any regulations issued pursuant to it. Plaintiff filed an arbitration complaint more than a year ago with the Department of Education but has not obtained a decision and does not anticipate one will be rendered due to the recalcitrance of the Department of Defense. The defendant has not objected to the Court's consideration of this issue and accordingly, under these circumstances, plaintiff will not be required to exhaust its administrative remedies."
At 294, n. 2.

5." [13] 5 U.S.C. § 702 provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." A person is defined as "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). Plaintiff argues that defendant cannot challenge the arbitration award because it is not a person under the APA.[14]

■ In harmonizing the reference to the APA in the Randolph-Sheppard Act with this court's jurisdiction, it is necessary to reject plaintiff's argument that defendant cannot seek review of the arbitration decision. For the purpose of suits maintained in the Claims Court, this section must be interpreted to incorporate only the review provisions of 5 U.S.C. § 706. Such a result is necessary because this court is without jurisdiction to enforce chapter 7 in its entirety. 5 U.S.C. § 705 sets forth equitable remedies beyond the jurisdiction of this

The decisions in other jurisdictions requiring prior arbitration are not persuasive. In *Texas* the court stated arbitration was mandatory and provided no reasoning for its decision. In *Fillinger* the court reasoned the amendments to the Randolph-Sheppard Act allowing arbitration reflected a congressional policy "that blind vendors must exhaust their administrative and arbitration remedies before seeking review in the district court." 587 F.2d at 338. The court in *Massachusetts Electric* found this reasoning persuasive and followed *Fillinger.* From the language of the statute, however, it appears Congress simply provided blind vendors with the option to pursue an additional avenue of relief rather than mandated prior arbitration in each instance. In addition, there is no indication in the legislative history that Congress intended to impose arbitration as a prerequisite to judicial relief. *See generally* 1974 U.S.Code Cong. and Ad.News, p. 6373.

**13.** Plaintiff's argument that the arbitration is final and not reviewable by this court must be rejected. According to 20 U.S.C. § 107d–2(a), this court may review the decision within the scope of review provided by 5 U.S.C. § 706.

**14.** This argument has been rejected by the one other court which has ruled on the issue. *Georgia Department of Human Resources v. Bell,* 528 F.Supp. 17, 22 (N.D.Ga.1981) (*amended on other grounds,* Apr. 16, 1982).

court. In addition, the Administrative Procedures Act is not a substantive statute for jurisdictional purposes. *See*, Brenner, *Judicial Review By Money Judgment in the Court of Claims*, 31 Fed.Bar J. 179, 183–85 (1961); *Califano v. Sanders*, 430 U.S. 99, 107, 97 S.Ct. 980, 985, 51 L.Ed.2d 192 (1977).

The United States is always a party before the court. To argue that only the plaintiff may challenge an arbitration decision would lead to an inequitable result.[15] There is a strong bias in favor of review of administrative action. *See Barlow v. Collins*, 397 U.S. 159, 166–67, 90 S.Ct. 832, 837–38, 25 L.Ed.2d (1970); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 139–143, 87 S.Ct. 1507, 1510–1513, 18 L.Ed.2d 681 (1967). It is likely that the intent of the legislation was to allow limited review of the award by request of either party in a court otherwise having subject matter jurisdiction.

This result is supported by the legislative history. The early provisions of what was to become the 1974 amendments provided that only blind persons and state licensing agencies had the right to judicial review. The language limiting review only to non-governmental entities was eliminated before passage of the 1974 amendments.[16] In addition, had Congress intended to limit the government's right to review, it could have explicitly so provided in the statute. *Compare* 5 U.S.C. § 7703(d); *Devine v. Nutt*, 718 F.2d 1048, 1052 (1983).

■ Finally, although we are dealing with nonappropriated funds, 28 U.S.C. § 2517 does not deprive the court of jurisdiction. Although the nonappropriated fund doctrine may be a limiting factor in the court's jurisdiction, it does not deprive this court of jurisdiction if appropriated funds may be used to fund the agency. *United States v. General Electric Corp.*, 727 F.2d 1567, 1570 (1984); *L'Enfant Plaza Properties, Inc. v. United States*, 229 Ct.Cl. 278, 668 F.2d 1211 (1982); *McCarthy v. United States*, 229 Ct.Cl. 361, 670 F.2d 996 (1982). A judgment need not be satisfied from the permanent judgment fund. 31 U.S.C. § 1304. A judgment in this case is in the nature of a refund and could be satisfied from defendant's Morale Welfare and Recreation Account as well as O & M appropriations. *See* GAO Report B–211206 (Sept. 27, 1984). Thus, we are not faced with the difficult question which would be presented were exercise of the Claims Court's judgment power sought to provide additional appropriated sums under 28 U.S.C. § 2517, 31 U.S.C. § 1304, in lieu of nonappropriated funds unlawfully retained and utilized by an agency. In such an instance, absent some indication that prior congressional approval existed for bypassing the legislative appropriation process, the Constitutional prohibition set forth in Article 1, § 9, cl. 7, might well apply. *See Great Western Ins. Co. v. United States*, 19 Ct.Cl. 206, *affirmed*, 112 U.S. 193, 5

---

15. The present situation is unlike *S & E Contractors, Inc. v. United States*, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972). In the present case there is no contractual provision prohibiting judicial review. In addition, unlike the contract disputes systems as construed in *S & E*, arbitration is not akin to a compromise procedure.

16. The language of the provisions as proposed in Senate Bill 2461, introduced in 1969, and Senate Bill 2506, introduced in 1971, was as follows:
"Sec. 10. Notwithstanding other provisions of this Act, *any blind person or State licensing agency* suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of this Act or other relevant statutes, *shall be entitled to*

and shall have standing for *judicial review* thereof." (Emphasis added.) The language proposed in Senate Bill 2581, which was later to become a part of the 1974 amendments was:
"Sec. 7. (b) Whenever any State licensing agency, designated as such by the Secretary under this Act, determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this Act or any regulations issued thereunder such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to section 6 of this Act, and the decision of such panel shall be *final and binding on the parties except as otherwise provided* in this Act. (Emphasis added.)

S.Ct. 99, 28 L.Ed. 687 (1884); *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). No such problem would arise were suit brought in a tribunal having the equitable jurisdiction to compel a refund of withheld sums.

### Merits

■ The issue presented in this case is one of statutory construction. Under the APA, questions of law are fully reviewable by courts. 5 U.S.C. § 706; *North Georgia Building & Construction Trades v. Goldschmidt*, 621 F.2d 697, 708 (5th Cir.1980); *Coca-Cola Co. v. Atchison*, 608 F.2d 213, 218 (5th Cir.1979); *General Ry Signal Co. v. Washington Metropolitan Area Transit Authority*, 527 F.Supp. 359, 360 (D.C.D.C. 1979), *aff'd*, 664 F.2d 296, *cert. denied*, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981).

■ In determining the meaning of a statute, the first inquiry must be directed to the statute's language. If the language is plain, the duty of interpretation does not arise and the function of the courts is limited to enforcing the statute according to its own terms. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). 2A Sands, *Sutherland Statutory Construction*, § 46.01 (4th ed.). When a statute is plain and unequivocal on its face, there is no need to resort to legislative history. *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 1281, 6 L.Ed.2d 575 (1961). However, when enforcement of the literal interpretation of a statute leads to "absurd" results such that a literal view would impute to Congress an irrational purpose, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purposes of the statute, *In Re Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to an "unreasonable"

result plainly at variance with the policy of the legislation as a whole, *Trustee of Indiana University v. United States*, 223 Ct.Cl. 88, 94, 618 F.2d 736, 739 (1980), literal interpretation will be eschewed in favor of a more flexible inquiry into legislative intent. 2A Sands, *Sutherland Statutory Construction*, § 46.07. Thus, if a statute's text is unclear or ambiguous and its words do not readily provide a plain meaning, a literal approach is unhelpful and it is appropriate to resort to legislative history. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; *Fitzpatrick v. Internal Revenue Service*, 665 F.2d 327, 329–30 (11th Cir.1982).

### a) *The Statute*

#### i) *Customary Meaning*

The statutory provision at issue appears unambiguous on its face.[17] The disputed phrase is "vending machines within retail sales outlets under the control of exchange or ships' stores systems." The term "within," a preposition, is defined as "used as a function word to indicate enclosure or containment," Webster's Third New International Dictionary (1967 ed.), and "in or into the interior of or the parts or space enclosed by," Random House Dictionary of the English Language (1967 ed.), or may mean "the inside of a place, space or building." *Id.* The common usage of the term contemplates spatial boundaries. Defendant's assertion that "within" may also mean "subject to" or "a part of" broadens its meaning and eliminates the connotation of spatial constraints. This strains the ordinary meaning of this term and must be avoided. 2A Sands, *Sutherland Statutory Construction*, § 46.01. The customary meaning of the term favors plaintiff's assertion that Congress intended to exempt vending machines located within physical boundaries, *i.e.*, retail stores.

---

**17.** Both HEW and GAO have maintained that the "plain meaning" of the exemption should prevail and that inquiry into legislative history is unnecessary. Memorandum to Leo Corbett, Special Assistant to the Secretary of HEW from Richard Beattie, Acting General Counsel of HEW (Apr. 12, 1977); Memorandum from Milton J. Socolar, General Counsel, GAO, to Director, Federal Personnel and Compensation Division, B–183894–O.M. (Feb. 26, 1979) (hereinafter "Socolar Memorandum").

Similarly, the term "outlet" is undefined in the statute. Unless Congress has clearly indicated a contrary meaning, its ordinary meaning is favored. *United States v. Snider,* 502 F.2d 645, 651 (4th Cir.1974). The term "outlet" has a common, everyday meaning of "a market for a commodity," "a retail store," Webster's Dictionary, *supra,* or "a store, merchant or agency selling one's goods." Random House Dictionary, *supra.* The ordinary and customary purport of the term "outlet" favors plaintiff's interpretation that the exemption applies to retail stores rather than to vending machines.

■ Defendant argues for an interpretation which would exempt all vending machines under the control of military exchanges or ships' stores systems. It would read the retail sales outlet limitation out of the statute and would render the phrase "within retail sales outlets" meaningless. Defendant's interpretation would ignore a limitation in the statute. Basic principles of statutory construction militate against this practice. Effect should be given, where possible, to every word of a statute so that no part will be rendered nugatory, superfluous, void or insignificant. 2A Sands, *Sutherland Statutory Construction,* § 46.06; *Ricker v. United States,* 184 Ct.Cl. 402, 396 F.2d 454 (1968).

### ii) *HEW's Interpretation*

Under § 107d–3(g) of the Act, the Secretary of HEW is charged with authority "to take such action and promulgate such regulations as he deems necessary to assure compliance" with the income-sharing provisions of the statute. This language has been construed as granting "broad rulemaking powers." *Blum v. Bacon,* 457 U.S. 132, 140, n. 8, 102 S.Ct. 2355, 2361, n.

8, 72 L.Ed.2d 728 (1982). The legislative history indicates that Congress intended to confer broad authority on HEW to carry out the Randolph-Sheppard Act. Congress viewed HEW as having the "expertness and sensitivity to the blind vendor program which may be lacking in other agencies." S.Rep. No. 937, 93rd Cong., 2d Sess. 19 (1974). HEW was considered to be the only possible choice for coordinating the blind vendor program on federal property. *Id.*

It is axiomatic that an interpretation of a statute by an administrative body charged with its implementation is accorded great weight as an extrinsic aid in the interpretation of statutes by the courts. 3 Sands, *Sutherland Statutory Construction,* § 65.05; *United States v. Clark,* 454 U.S. 555, 565, 102 S.Ct. 805, 811, 70 L.Ed.2d 768 (1982). HEW has consistently construed the military exemption as applying only to vending machines within the four walls of retail outlets.[18]

### iii) *Statutory Scheme*

The statute reveals a congressional desire to ensure DOD compliance. For instance, Congress provided for a survey of vending opportunities afforded blind vendors on federal property. The statute requires particular scrutiny of opportunities on DOD, GSA and the Postal Service property. 20 U.S.C. § 107a(a)(2). This emphasis was not present in earlier legislation. Its inclusion in the 1974 amendments highlights increased congressional concern for the program's development on these properties. DOD's interpretation of the exemption would severely restrict blind vendor opportunities on DOD property and the survey provision would be rendered meaningless.

---

**18.** *See* Notice of Proposed Rulemaking on December 23, 1975, 40 Fed.Reg. 59408. 40 Fed. Reg. 59414 (Dec. 23, 1975) (proposed rules); 42 Fed.Reg. 15814 (Mar. 23, 1977) (final rules); 45 C.F.R. § 1369.32(i) (1980); 34 C.F.R. § 395.32(i) (1982).

Defendant points to draft regulations considered, but subsequently rejected, by HEW in April 1975. These reflect defendant's interpretation of the exemption. Defendant views the

inconsistent interpretation as undermining HEW's longstanding narrow interpretation and argues less judicial deference which should be accorded to HEW's interpretation. *See also Oklahoma v. Weinberger,* 741 F.2d 290, at 292 (10th Cir.1983). The fact that HEW *rejected* the broader interpretation of the exemption, however, is significant. Arbitration Panel Decision at 17.

In addition, the text of the statute demonstrates that Congress could create unambiguously a blanket exemption from the income-sharing provisions. Congress exempted without limitation "income from vending machines operated by the Veterans Canteen Service." The military exemption does not contain similarly broad language.

Defendant argues that if plaintiff's interpretation is adopted, the military exemption would duplicate the $3,000 exemption. Defendant reasons that all vending machines within retail sales outlets are already covered by the latter exemption. The $3,000 exemption was a compromise provision intended to mollify *non*-DOD federal employees who strenuously opposed the blind vendor program. Socolar Memorandum, *supra,* at 6. There is no evidence that Congress considered the overlapping nature of the two exemptions. Arbitration Panel's Decision at 14, n. 22. In addition, although vending machines within retail sales outlets of the exchanges may have produced income of $3,000 or less in 1978 and qualified as exempt under two exemptions, it is entirely probable that Congress anticipated that the vending machine income would exceed $3,000 in the future.

b) *Legislative History*

Even if the exemption is ambiguous and legislative history is consulted, defendant's interpretation is not persuasive. Although defendant's position is supported by selected excerpts of legislative history, it is not supported by the Act as a whole.

Defendant relies very heavily on two excerpts of legislative history. The portion of Senate Report No. 937,[19] which defendant cites as exempting the "military exchange systems" from income-sharing includes other references to the same exemption. These excerpts support a narrower interpretation. The report states:

Subsection (d) provides that the assignment of income provisions of subsections (a) and (b)(1) do not apply to vending machine income from military exchange retail outlets * * *.

Report at 21.

Subsection (d) excludes from application of this section [the income-sharing provisions] vending machine income from retail outlets of military exchanges * *.

Report at 30.

The text of the Report cited by defendant is ambiguous when read in conjunction with contrary references in other sections of the same document.

Furthermore, the Conference Report, which is more persuasive of congressional intent than committee reports, *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir. 1981), describes the exemption as excluding vending machines in "certain locations" from income-sharing. This suggests that individual retail outlets are within the exemption but that vending machines in multiple locations are excluded. S.Rep. No. 93–1270, 93rd Cong., 2d Sess. 35 (1974) and H.R.Rep. No. 93–1457, 93rd Cong., 2d Sess. 35 (1974).

■ Defendant maintains that the most persuasive evidence of congressional intent is the Brademas-Sikes colloquy of October 16, 1974.[20] *See also Oklahoma v. Weinberger,* 741 F.2d 290, at 293 (10th Cir.1983). Rep. Brademas was a floor manager of the 1974 legislation and the chairman of the House Subcommittee that sponsored the bill (H.R. 14225). Although remarks made by a member of a committee in charge of a bill are generally considered in construing the enacted legislation, such statements are not given effect to override a clear and unambiguous meaning conveyed by the statutory language. 2A Sands, *Sutherland Statutory Construction,* ¶ 48.14. Here, the interpretation is at odds with the statutory language as well as the ordinary meaning of the phrase "within retail sales outlets." Therefore, the dialogue is less significant in determining congressional intent. Even GAO described the dialogue as

19. *See* n. 11.

20. *See* n. 10.

"isolated statements of individual legislators" and rejected it as unpersuasive in view of the clear statutory language and countervailing legislative history. Socolar Memorandum at 2. The colloquy's significance is further diminished by the fact that it occurred on the House floor several weeks *after* the Senate passed the legislation and several days *after* the Senate unanimously agreed to the Conference Report. S.Rep. No. 1297, 1974 U.S.Code & Ad.News at 6377. *Weinberger v. Rossi,* 456 U.S. 25, 35, 102 S.Ct. 1510, 1517, 71 L.Ed.2d 715 (1982); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 117–18 and n. 13, 100 S.Ct. 2051, 2060–61 and n. 13, 64 L.Ed.2d 766 (1980). Clearly, one cannot say that the Senators who voted for the language in issue did so with any understanding of the meaning reflected in this subsequent colloquy. *See Aparacor, Inc. v. United States,* 215 Ct.Cl. 596, 604, 571 F.2d 552, 556 (1978).

More importantly, the Brademas-Sikes colloquy pales in significance when viewed in conjunction with the remaining legislative history. Congress was greatly concerned that competition from automatic vending machines threatened to suffocate the blind vendor program. S.Rep. No. 937, *supra,* at 10. The legislative history is replete with congressional concern for the failure of the program on DOD property. Congress found that military installation commanders were "singularly insensitive" to the need to develop the program, *id.* at 10, and that they were either "hostile or indifferent to the program." *Id.* at 17. These attitudes hampered the program development and led to the insignificant number of blind vendors of DOD property.[21] In fact, DOD was described as a "virtual monolith of opposition" to the Randolph-Sheppard program. 121 Cong.Rec. 16228 (1975).

Defendant's insistence that the income-sharing provisions were directed at the civilian sector and not at military personnel and their programs is not supported by the legislative history. Rather, Congress stressed uniform application of the Randolph-Sheppard Act by *all* federal officials. Rep. Perkins, House manager of the legislation, specifically stated that the legislation was not "directed to any one Federal activity more than any other." 120 Cong. Rec. 35710–11 (1974). In fact, Congress singled out a Marine Corps supply base in Albany, Georgia for its exemplary compliance with the Randolph-Sheppard program. S.Rep. No. 937, *supra,* at 17. There were five blind vendors operating snack bars and cafeterias on the base. Congress expressed the hope that the DOD would "use the experience of the Albany, Georgia facility as a 'model' for all Defense installations." *Id.*

Since a majority of vending machines on DOD-controlled property are operated by the post exchange systems of the various services, *GAO Report, supra,* at 28 [22] an exception from income-sharing for all such machines would result in little or no opportunity for blind vendor employment on DOD installations. This interpretation would frustrate the congressional purpose that the Randolph-Sheppard Act be "one of the most practical and effective employment opportunities ever enacted by Congress." S.Rep. No. 937, *supra,* at 13.

---

**21.** As of 1974, the Defense establishment reported 9 blind vendors at Air Force facilities, 17 on Army posts and 16 at Navy bases. S.Rep. No. 937, *supra,* at 10.

**22.** For instance, virtually *all* vending machines on Marine Corps installations are operated by the exchange systems. Memorandum to Tom Lewis, Office of Management and Budget, from Clare Moelk, Assistant Director, Personnel Administration and Services, Department of Defense (May 12, 1978). As a representative of GAO testified before the Subcommittee on the Handicapped (Hearings Before the Subcomm. on the Handicapped of the Senate Committee on Labor and Human Resources, 96th Cong., 1st Sess. 4 (1979) (Statement of H.L. Kreiger, Director, Federal Personnel and Compensation Division, GAO)), of the estimated 43,952 vending machines operated by the Army & Air Force Exchange Services, 43,372 machines would be exempt if DOD's interpretation were adopted. The remaining 580 would be exempt under the $3,000 provision.

Courts owe a duty to avoid where possible the effective nullification of a statute. *Hardee v. United States,* 708 F.2d 661 (Fed.Cir.1983) (Markey, Chief J., dissenting).

*Conclusion*

 An examination of the legislative history, coupled with the plain meaning of the statutory language, renders defendant's view of the exemption unpersuasive.

Accordingly, it is ORDERED:

(1) Defendant's motion for summary judgment is denied;

(2) Plaintiff's cross-motion for summary judgment on the issue of liability is granted;

(3) The matter is remanded to the arbitration panel for determination of the amount involved, as required by 20 U.S.C. § 107d–2(b);

(4) Following a final decision as provided by (3), the Secretary of Defense shall take such action as may be necessary to provide for prompt payment of any amount so determined to be due and owing, as required by 20 U.S.C. § 107d–2(b);

(5) Final judgment shall be entered as stated above and, except for the relief so granted herein, plaintiff's complaint shall be otherwise dismissed;

(6) Absent payment, within a reasonable time, of any amount found to be due by the arbitration panel pursuant to (3)–(4), upon motion by plaintiff, pursuant to Rule 60(b)(6), the instant matter shall be reinstated on the docket of the court for further appropriate action;

(7) Alternatively, given the recurring nature of the dispute and the contrary decision in *Oklahoma v. Weinberger, supra,* it is concluded that, to the extent the ruling herein constitutes an interlocutory order, the matter involves a controlling question of law with respect to which there is a substantial ground for difference of opinion, and immediate appeal from the order entered herein may materially advance the termination of the litigation. Accordingly, this opinion is certified for immediate interlocutory review, pursuant to 28 U.S.C.A. § 1292(d)(2) (West Supp.1984), should either party seek such appeal.