SMITH, Circuit Judge, with whom NEWMAN, Circuit Judge,
joins, dissenting.
I respectfully dissent.
The purpose of the Randolph-Sheppard Act is to create employment opportunities for the blind by requiring a priority for blind vending stands on all federal property. The priority is achieved and protected by requiring that income from vending machines operated by competitors must be shared with the blind vendors.
At issue in this appeal is the meaning of the exemption from income sharing for “vending machines within retail sales outlets under the control of exchange or ships’ stores systems.”[1] Also at issue are two conflicting approaches to statutory construction.
A substantial portion of the majority analysis is based on the silence of Congress with respect to military exchange appropriations. The majority also relies on a colloquy which took place on the House floor when a quorum was not present. On this tenuous basis, the majority established “congressional purpose” in the face of the admittedly clear language of the statute.

Plain Meaning of Statute

I can see nothing ambiguous or superfluous in the statutory exemption for “income from vending machines within retail sales outlets under the control of exchange or ships’ stores systems.” HEW, GAO, the arbitration panel, and the Claims Court reached the only possible conclusion when they decided that vending machines which are not within such retail sales outlets are not exempt from income sharing.
The majority, at the urging of DOD, has rewritten the statute by deleting the words “within retail sales outlets” from Congress’ own language. The statutory exemption, as rewritten by the majority, now reads: “income from vending machines under the control of exchange or ships’ stores systems.” Only after rewriting the statute is it possible to conclude that the exemption covers all vending machines operated by the military exchanges, without regard to the machines’ location.
The word “ambiguity” has been defined as “uncertainty of meaning” or “admitting of two or more meanings.”[2] As for “uncertainty of meaning,” it is not difficult to understand “within retail sales outlets” as having the certain meaning “inside the four walls of an exchange system store” (commonly known as “the PX”).[3] As for “admitting of two or more meanings,” the majority never reveals what other meaning “within retail sales outlets” has.[4]
Contrary to the majority’s assertion, the Tenth Circuit did not hold or even imply that the statute was at all ambiguous. The
*418 Tenth Circuit stated in Oklahoma v. Wein-berger: [5]
We agree with DHS [Department of Health and Services of the State of Oklahoma] that a literal reading of the exception limits the exception from revenue sharing only to “vending machines within retail sales outlets under the control of exchange or ships’ store systems.” * * [Emphasis in original.]
Similarly, the district court in Oklahoma found that “[^ejection of the ‘plain meaning' of the exemption” was necessary because: [6]
Following the literal meaning of the words would, in this case, compel concurrence with the plaintiff’s position as “vending machines within retail sales outlets” would appear to refer to machines within an exchange store. * * *
Rather, the rationale of the Tenth Circuit and the Western District of Oklahoma was that:[7]
a court has “some [‘]seope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute[.’] ...” * * *
I agree with the Tenth Circuit that the statute is unambiguous. But notwithstanding my great respect for the Tenth Circuit, I cannot agree that the literal meaning of the words would lead to “absurd results” or “thwart the obvious purpose of the statute.”[8]
A. Clear, Customary Meaning.
Section 107d-3(d) states:[9]
(d) Income from vending machines in certain locations excepted
Subsections (a) and (b)(1) of this section shall not apply [1] to income from vending machines within retail sales outlets under the control of exchange or ships’ stores systems authorized by title 10, or [2] to income from vending machines operated by the [V]eterans Canteen Service * * *.
This section creates distinct exemptions: one for the exchange systems and another for the veterans canteen service.
The exemption provided for the exchange systems, unlike the one provided for the canteen system, contains two phrases of modification. Not only must the machines be “under the control of” the exchange system, the machines must also be “within [its] retail sales outlets.” As the Claims Court correctly determined, the plain and customary meaning of the word “within” clearly connotes spatial boundaries.[10] The common usage of the word “within” is “to indicate enclosure or containment.”[11] Thus, as the majority concedes, the customary meaning of “within retail sales outlets” is “physically within the walls of a store.”
DOD argues that “within” implies more than just “contained in” and that the exemption protects all machines operated by *419 the military exchanges.[12] DOD contends that “within” can mean something other than spatial proximity—for example when used to mean “within the law.” [13]
In the context of section 107d-3(d), DOD’s interpretation would require this court to hold that “within” really means “within and without.” DOD’s interpretation completely reads out of the statute the phrase “within retail sales outlets.” Basie principles of statutory construction require that effect should be given to every word of the statute so that no part will be rendered meaningless.[14] The two distinct phrases of modification in the statute clearly suggest that vending machines must be more than “under the control of” the military exchanges. The machines must also be “within [a] retail sales outlet.”
No definition for “within” urged by DOD makes sense when read in the context of section 107d-3(d). If Congress had simply meant “under the control of” the military exchanges, it would not have included the phrase “within retail sales outlets” in the statute at all. DOD considers the word “within” in isolation and discusses the almost metaphorical meanings that it can take on in other contexts. As this court has recently explained, statutory words “cannot be considered in a vacuum. We sit to interpret a statute, not a word.” [15]
The majority also accepts DOD’s argument that the phrase “retail sales outlet” can describe “a cluster of vending machines or even a single vending machine” and that the statute, thereby, exempts all machines. The first error in this strained interpretation is that it is contrary to the accepted meaning of the word “outlet.” The term outlet has a common, everyday meaning of “a market for a commodity” or “a retail store.” [16] It is well settled that unless Congress has clearly indicated a contrary meaning, a word’s customary, everyday meaning is favored.[17]
A second problem with DOD’s construction of the phrase “retail sales outlet” is that, in context, it makes the statute meaningless. By equating a vending machine with a “retail sales outlet,” DOD construes the statute to exempt “income from vending machines within vending machines.” Such a bootstrapped definition would read all meaning out of the exemption. The Claims Court reached the correct interpretation by accounting for all of the words in the statute, without nullifying any of its terms.
B. Veterans Canteen Service Exemption.
DOD’s construction of the statute is as follows:
*420 The literal words of the statute may fairly be read as exempting from income sharing any vending machine that is a part of [“within”] a network of sales facilities [“retail sales outlets”] operated by or for a military exchange. * * * [Emphasis supplied.]
Thus, DOD is really arguing to be treated like the veterans canteen service. Section 107d-3(d) specifically exempts “vending machines operated by the Veterans Canteen Service” (emphasis supplied). The wording of the exemption for the canteen service proves two things. First, Congress knew how to draft the exact exemption that DOD wants, because it did so in the very next clause. Second, this exemption proves that Congress only wanted to provide this broad exemption (encompassing all machines, regardless of location) to the veterans canteen service.[18]

Legislative History

Where the words of a statute are clear, there is no need to review the legislative history.[19] A corollary is that the legislative history cannot be used to create ambiguity where there is none in the statute.[20]
The majority has placed great reliance on excerpts from the legislative history; how-
ever, other portions of the same reports give a clear indication that Congress fully addressed a much broader problem than that spotlighted by the majority. In addressing that part of the majority opinion, the words of our predecessor court, the Court of Customs and Patent Appeals, give us guidance:[21]
We have dwelt at some length upon this phase of the case not because we regard the statute as ambiguous, because we do not so regard it, but out of respect for the views of those who think otherwise. Even if we be in error as to this, however, we do not regard such legislative history as has been cited here controlling.
A. Purpose of the Act.
The majority unacceptably narrows the purpose of the act by focusing only on “civilian employee groups.” Thus, the majority ignores Congress’ language reaching “all Federal property,” including DOD and military bases in particular.
Notwithstanding the appeal of arguments made on behalf of the military, the Randolph-Sheppard Act is primarily legislation in support of the blind. The primary purpose of Congress was to create a 2- *421 pronged approach to establish a priority for blind vendors. First, Congress ordered that one or more blind vending stands must be placed on all federal property.[22] Congress recognized, however, that since 1936 the act had already required a “preference” for blind vending stands on all federal property. The act had been unsuccessful because of competition from vending machines:[23]
Blind vendors collectively have been confronted with obstacles at virtually every turn. Competition from automatic vending machines has increasingly threatened to suffocate the blind vendor program.
The act had been amended in 1954 to require the assignment of vending machine income to blind vendors, where vending machines were in direct competition with the blind:
The provision was believed necessary due to the unanticipated growth of automatic vending machines on Federal property, which were beginning to affect blind vendor operations. Unfortunately, that language did not have the desired effect of protecting the livelihood of blind vendors. On the contrary, in the intervening twenty years since the enactment of the provision, the automatic vending machine has been vastly improved, the kinds of food and other merchandise sold through such machines have greatly expanded, and the numbers of machines on Federal property have grown exponentially. Not only has the existing language failed to protect the blind vendor, in many cases the language has been disregarded, and vending machines now constitute a major threat both to the livelihood of individual blind licensees and to the growth of the program as a whole.
The existing law in 1974 already required a preference for blind vendors on military bases. Yet there were only 46 blind vending stands on 490 military bases.[24] Congress was forced to take decisive action to achieve its stated goal of one or more blind vendors on every military base.
Thus, Congress created the second prong, called “income sharing” to “achieve and protect” the priority for blind vendors.[25] Income sharing was enacted to prevent competitors from driving blind vendors out of business. A competitor who placed vending machines at the same location as the blind vendor was required to assign 100 percent of the vending machine net income to the blind vendor.[26]
Similarly, the competitor could not continue to block the placement of a blind vending stand. Even if the competitor succeeded at keeping the blind vendor off the federal property altogether, the competitor was still required to share 50 percent of the vending machine net income with state blind associations.[27]
*422 Congress designed income sharing to “remedy the evil” of vending machine competition facing blind vendors.[28] The two prongs of Congress’ approach go hand-in-hand. The admitted priority for blind vendors on military bases simply cannot be “achieve[d] and protect[ed]”[29] without the income-sharing provisions of the act.
There can be no doubt that Congress specifically targeted the “evil” of DOD abuses of the Randolph-Sheppard Act when it enacted the 1974 amendments:[30]
Commanders of military installations are singularly insensitive to the need to develop the program. The vast Defense establishment can report only 9 blind vendors at Air Force facilities, 17 on Army posts, and 16 at Navy bases. The parent Defense Department association at a major Federal space installation demanded that blind vendors give a portion of their income to the association—precisely the reverse of what should be taking place on Federal property. * * It can be concluded from this and other evidence that there are widespread, major abuses of blind vendors and of the Randolph-Sheppard program. It is the firm resolve of the Committee that such abuses must cease. [Emphasis supplied.]
>K $ >ic ♦ jfc
Very few blind vendors are to be found at military installations. Witnesses before the Committee have stated that each military post or base commander is in charge of his particular installation, and that, for the most part, commanders are either hostile or indifferent to the Randolph-Sheppard program. This attitude has severely curtailed the growth of the program within the Defense Department. Lt. General Leo Benade, the department’s witness in the hearings on S. 2581, recognized the deficiencies. He said:
“I do not think the military departments ... are insensitive, but I am not very proud of our record, and I think we can do better, and we will.!’
The majority concedes that one or more blind vending stands must be placed on every military base, but the majority takes the teeth out of the statute by recognizing only the first prong (priority for blind vendors on every base) and not the second prong (income sharing “to achieve and protect such priority”).[31]
B. Sound and Meaningful Distinction.
DOD argues that the interpretation arrived at by the Claims Court leads to an “absurd result” because it
creates a distinction—between machines physically located inside the four walls of retail stores and machines in other locations—that cannot be justified by reference to any logical policy * * *]
Although this contention is stated emphatically, DOD offers no argument or reasons to back it up.
The distinction between machines within retail stores and those in other locations *423 appears to be consistent with Congress’ goals and of the compromise struck between the exchange system and the blind. Congress exempted from the income-sharing provisions the revenue from machines located within the exchanges, thereby allowing the exchanges to sell within the store, by machine, whatever they could sell ordinarily. Thus, a blind vendor could not claim that, because an exchange store was selling cigarettes or drinks from a machine rather than by a human, he was entitled to share the income. On the other hand, the exemption does not allow the exchanges to nullify the priority for blind vendors by placing competing vending machines over the entire base.
It is DOD’s interpretation that leads to a result plainly at variance with the purpose of the statute, because the interpretation would grant DOD the power to completely circumvent the act. DOD regulations expressly deny the priority for blind vendors with respect to vending machines operated by the exchange system.[32] Thus, if DOD's interpretation prevails, it could keep all blind vendors off military bases by ruling that a blind vendor would be competing with a machine operated by the exchange system. This self-appointed power was pointed out to Congress by GAO and it formed a basis for the narrow compromise exemption.[33]

C.Congress’ Silence on PX Appropriations.

One of the consequences of the Randolph-Sheppard Act is that military exchanges are subject to income sharing from vending machines outside the PX stores. The cost of compliance with the act would be less than 4 percent of the exchanges’ total annual income.[34] The act is completely silent about additional appropriations for the military exchanges to make up for the income sharing. This is not surprising, since this particular act was intended to help the blind; its primary purpose was not to help soldiers and sailors.
The majority, however, attaches great significance to Congress’ silence. Under the majority’s view, it is not sufficient for Congress to require the military exchanges to share income with the blind. Congress also must demonstrate that it has considered whether additional appropriations will be necessary for the military exchanges.[35]
The Supreme Court has warned of the danger in the majority’s approach: “[t]he search for significance in the silence of Congress is too often the pursuit of a mirage.”[36] In still another case, the Supreme Court stated:[37]
[I]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark. [Citation omitted.]
The Supreme Court “has never insisted that a legislative body articulate its rea *424 sons for enacting a statute.”[38] Thus, it is not a function of the courts to “presume that ‘Congress was unaware of what it accomplished____’ ”[39]
Congress was not obliged to discuss military PX appropriations in this statute related to the blind vending program. The majority errs in pursuing “the theory of the dog that did not bark.”
The majority’s reliance on PX appropriations in other legislation totally unconnected to the Randolph-Sheppard Act is too remote to be relevant in discerning legislative intent in the present act.[40]
D. Colloquy on the House Floor.
Historically, the courts have been extremely reluctant to consider statements made by legislators during floor debate. In the landmark case of Aldridge v. Williams,[41] the Supreme Court held:
In expounding this law, the judgment of the court cannot, in any degree, be influenced by the construction placed upon it by individual members of Congress in the debate which took place on its passage, nor by the motives or reasons assigned by them for supporting or opposing amendments that were offered. The law as it passed is the will of the majority in both houses, and the only mode in which that will is spoken is in the act itself; and we must gather their intention from the language there used
Explanatory statements made by the committeeman in charge of the bill when presenting it for passage have been used as an “aid to the interpretation of a statute where its language is doubtful or obscure.” [42] “But while they may be looked at to explain doubtful expressions, not even formal reports—much less the language of a member of a Committee—can be resorted to for the purpose of construing a statute contrary to its plain terms.”[43]
The Supreme Court again explained the limits on the use of statements by the committeeman in charge of the bill:[44]
[W]hen taking the act as a whole, the effect of the language used is clear to the court, extraneous aid like this can not control the interpretation. [Citations *425 omitted.] Such aids are only admissible to solve doubt and not to create it. * * *
It is impossible to discover the “intention of Congress” from remarks made by individual legislators on the congressional floor.[45] The safest guide to congressional intent is found in the words employed by Congress in the statute.[46]
Judge Skelly Wright has stated:[47] [Q]uotes from legislative floor debate do not persuade us to deviate from the statute’s clear language. * * *
* * * [T]he significance of such comments from legislative floor debates is limited, not only because of such clear statutory language, but also because “[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. * * * ” [Citation omitted.]
As our predecessor, the Court of Claims, has cautioned:[48]
Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended. It is foolish to abandon this presumption where the legislative history is perceivably full of pitfalls that cannot readily be avoided. Some pitfalls are invisible to the judicial eye, but the most myopic can see one in a committee report that contradicts the plain language of a statute in guise of interpreting it, or makes manifestly incorrect statements about it or what it does. * * *
The “judicial eye” must see that there are pitfalls in resorting to floor debate which “contradicts the plain language of a statute in guise of interpreting it.” Indeed, a member of Congress has warned us that legislators may enter into a “friendly colloquy” in the hope that the courts will accept their language instead of the plain language of the statute:[49]
Mindful of this judicial scrutiny, legislators of today have used the opportunity of debate to achieve legislative goals which might otherwise be unattainable. Indeed, by the use of the “friendly colloquy,” two men may be able to legislate more effectively than all of Congress.
This type of colloquy is presented in the form of a friendly exchange of questions and answers about the pending legislation between members, one of whom is usually a member of the committee from which the legislation emanated. This seeming repartee is not accidental. In fact it is just the opposite. It has been carefully planned by the parties for the express purpose of providing a legislative interpretation of a statutory provision which might otherwise be differently interpreted.
Turning now to the colloquy relied upon by the majority, it can be seen that under the “guise of interpretation]” Congressman Sikes “contradicts the plain language of the statute” and makes “manifestly incorrect statements about it or what it does.”[50] Sikes quotes the statutory language limiting the exemption to “vending machines ‘within the retail sales outlets,’ ” and then in the next sentence “presume[s] * * * that this provision exempts from the revenue-sharing plan all those vending ma *426 chines which are operated by the military post exchanges * * * and so forth.”[51] (Emphasis supplied.) He continued by stating that the income-sharing provisions “shall not apply to the military services ” (emphasis supplied), a statement so clearly erroneous that even DOD acknowledges that the exemption is not so broad as Sikes claimed. Sikes also indicated his concern for the funding of the “worthwhile endeavors” of the military exchange program, stating his belief that additional appropriations for that year would be impossible.
The majority opinion would give legislative effect to the overbroad statements of one member of Congress by means of the terse answer “yes” given by another member. The classic response to this is that a shorter and more accurate answer by the second gentleman would have been “no.”
Perhaps the greatest danger in rewriting the statute on the basis of this colloquy, not addressed in the majority opinion, is that there was not a quorum present when the colloquy took place[52] Thus, the “two men [were] able to legislate more effectively than all of Congress.” [53]
With apologies to Gilbert and Sullivan,[54] it may be observed that:
“Things are seldom what they seem Skim milk masquerades as cream.”
Two and two aren’t always four
In dialogue upon the floor
Of any legislative forum,
In the absence of a quorum.
This circumstance may be revised,
Now all debates are televised. Attendance now, so we envision,
Will improve with television.
I have no doubt that Congressman Sikes was sincere in his concern for the welfare of the military exchanges; indeed, I would expect such concern from the Chairman of the House Armed Services Committee. Nor do I question the authority of Congress to enact a statute such as Sikes would have preferred.
There is no doubt that if Sikes had been successful in amending the bill to delete the words “within retail sales outlets,” and if Congress had passed such a bill, this court would give effect to the resulting statute. The only hitch is that the bill was not amended to delete the language to which Sikes objected.
DOD comes to this court asking us to give effect to the language of Congressman Sikes (before less than a quorum of 1 house) rather than the language of the statute enacted by Congress. This we cannot do under the precedent of the Supreme Court and our predecessor courts. “Even assuming, for the time being,” that it would make more “economic sense” to exempt all vending machines instead of only those machines “within retail sales outlets”: [55]
[W]e would only be left with the fact that Congress could have promulgated a better and more meaningful statute. Nevertheless, to improve legislation is certainly not the function or responsibility of the court. “[0]ur problem is to construe what Congress has written. After all, Congress expresses its purpose by words. It is for us to ascertain—neither to add nor to subtract, neither to delete nor to distort”. * * *
*427 “Since Congress thought there was a reason”[56] to grant an exemption for vending machines “within retail sales outlets,” but not for vending machines in other locations, “we cannot say otherwise.”[57]
The Court of Claims further stated in Ricker:[58]
Defendant would have us delete or ignore the clear language of the statute. We must adhere to the rule stated in Prudential Ins. Co. of America v. United States * * *: “It is fundamental that an unambiguous statute should be given effect according to its plain and obvious meaning”. [Citation omitted.]
It is not within the power of this court to rewrite the Randolph-Sheppard Amendments of 1974 under the rationale of “no economic sense.”
I would give effect to the words employed by Congress. The exemption from income sharing applies to “vending machines within retail sales outlets under the control of exchange or ships’ stores systems.” All other vending machines under the control of the exchange systems are subject to income sharing, as provided by the Randolph-Sheppard Act.[59]
E. Subsequent Letters from Congressmen.
The majority errs in relying on letters, written by individual congressmen subsequent to the bill’s enactment, as evidence of “the intent of Congress.”[60] As the Court of Claims has stated:[61]
How [a congressman] could possibly have “personal knowledge of the object or intention of the enactment” by both Houses of Congress is not easy to comprehend. At most he could have only personal knowledge of his own object and intention, and that would not go far towards showing the object and intention of each, or of a majority of the several hundred members of the House of Representatives and of the members of the Senate in passing the act, * * *.
Furthermore, if subsequent interpretations were relevant, the 1979 Oversight Hearings indicate that Congress enacted exactly the words it intended in the 1974 statutory exemption. Senator Randolph, the author of the act, was highly critical of DOD’s noncompliance with both the act and the HEW regulation concerning vending machine income sharing.[62]
Just as the colloquy was ineffective to amend the language of the bill, the subsequent letters were ineffective to amend the language of the statute.
In sum, the legislative history of the act reveals its sweeping purpose to combat the “widespread, major abuses” of the blind vendor program and to double the number of blind vendors on all federal property. DOD alone was characterized as “singularly insensitive” and “hostile or indifferent” to the program. DOD was criticized not only for its abuses of blind vending stands but specifically for the military exchanges’ use of vending machines to compete with blind vendors.[63] The amendments were adopted to protect the blind from the military exchanges and not vice versa.

*428
HEW Interpretation

Congress expressly stated its desire and reason for regulatory supremacy in HEW:[64]
The Committee finds that there is a record of abuses and neglect of the Randolph-Sheppard program by officials of various Federal agencies that is adequate to justify the placement of increased overall authority for its operation with the Secretary of Health, Education, and Welfare. * * *
The Committee believes that the Department of Health, Education, and Welfare should be the overseer of the Randolph-Sheppard program throughout the Federal government. As such, it is inevitable that there will be some, incursion by that department in matters traditionally handled by other agencies. The Department of Health, Education, and Welfare, however, has the expertness and the sensitivity to the problems inherent in the blind vendor program which may be lacking in other agencies. If the program is to be coordinated, well run and consistent, it must have a coordinator. The only possible choice for this function is HEW.
Congress acted on the committee’s recommendations by granting both broad and specific powers to HEW alone. Thus, HEW shall prescribe regulations to assure the priority for blind vendors (including income sharing “to achieve and protect such priority”).[65] HEW shall prescribe regulations establishing one or more vending facilities on all federal property.[66] “A determination made by the Secretary [of HEW] pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination.”[67]
HEW shall “make annual surveys of concession vending opportunities for blind persons * * * particularly with respect to * * the Department of Defense.”[68] HEW shall convene arbitration panels to decide disputes under the Randolph-Sheppard Act.[69]
Finally, and most significantly:[70]
The Secretary [of HEW~\ shall take such action and promulgate such regulations as he deems necessary to assure compliance with this section [concerning vending machine income sharing].
Given the statute and the express statements of Congress, the majority’s conclusion that HEW is “only on a par with DOD” in promulgating regulations under the act is surprising, to say the least.
For two reasons, the majority misplaces its reliance on Executive Order No. 12,-146,[71] which only states that if two executive agencies disagree on the interpretation of a statute, they may submit the dispute to the Attorney General “prior to proceeding in any court” (emphasis supplied). First, the Department of Justice is not allowed to issue a ruling on a matter already in litigation.[72]
*429 Thus, in Oklahoma v. Weinberger,[73] the Department of Justice was not functioning in the neutral position that the Tenth Circuit assumed. As the letter upon which DOD bases its argument clearly states, the issue reached the Department of Justice only after suit was filed in Oklahoma. The Department of Justice was already functioning as the Government’s lawyer in response to pending litigation against the United States. The Department of Justice was merely advising its client not to take any action that would compromise the litigation in progress. The Department of Justice thus issued no formal opinion, nor could it have under federal law, because the matter was under litigation.
The majority errs in stating that Justice’s interpretation in litigation is binding. The United States is always a party in the Claims Court, where it is represented by the Department of Justice. Under the majority’s analysis, the Department of Justice could issue a binding ruling in every case, and there would be no need for a Claims Court.
Second, it is inaccurate for the majority to suggest that conflicting regulations of two agencies are entitled to equal weight, without regard to the statutory authority of the agencies. Here, the respective authority of HEW and DOD can be determined only in reference to the act, which overwhelmingly rejects the majority’s assertion that the agencies are “only on a par.”
The majority criticizes the HEW regulation because it merely “repeat[s] the statutory language.” In my view, a better basis for disregarding a regulation of the authorized agency would be if the agency did not follow the statute.[74] Furthermore, the fact that HEW did not find it necessary to depart from the statutory language, stating that only an amendment by Congress could effect such a change, is a powerful indication that the statute was clear and unambiguous.
The majority states that “there is no basis for deference to the interpretation by HEW” because HEW has “vacillated internally.” A close reading of the majority opinion, however, discloses the fact that HEW published its final regulation on March 23, 1977, and HEW has never changed or withdrawn this regulation.
Advocates for DOD wrote letters attempting to prevail upon HEW to change its regulation. It is this flurry of correspondence which the majority describes as evidence of “internal vacillation.” If the correspondence proves anything, it is that HEW carefully considered the views of DOD as well as the language of the statute before it promulgated its regulations. This initial correspondence was never promulgated or published, but even if it had been, it would not be sufficient to undermine HEW’s credibility. The United States Supreme Court has recently explained:[75]
The fact that the agency has from time to time changed its interpretation of the term “source” does not, as respondents argue, lead us to conclude that no deference should be accorded the agency’s interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemak-ing, must consider varying interpretations and the wisdom of its policy on a continuing basis. * * *
When it became clear to DOD that HEW would not change its regulations, DOD acted upon HEW’s advice and attempted to introduce legislation to amend the Randolph-Sheppard Act to delete the words “within retail sales outlets.” DOD’s legislative proposal was not acted on, however, and the statutory exemption remained unchanged.
Undaunted, DOD proceeded to publish its own final regulations exempting all *430 vending machines “operated by or for the military exchanges.”[76] DOD acknowledged comments disagreeing with its version of the exemption, but it refused to change the DOD regulation.[77]
The majority “conclude[d] that the interpretation of DOD, as the agency compelled to apply the statutory exemption, is the only authoritative administrative construction.”[78] Clearly, the majority has erred.

Conclusion

The majority has rewritten a clear statute despite its plain meaning, the legislative history supporting that plain meaning, and the interpretation of the authorized agency. Thus, DOD has accomplished through the courts what it was unable to accomplish in the legislature or in the executive branch.
I would affirm the judgment of the United States Claims Court.

. 20 U.S.C. § 107d-3(d) (1982).

. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 66 (1967).

. Contrary to the majority’s implication, a court’s act of explaining a statute is not evidence of ambiguity. The very function of the courts is to apply statutes and necessarily to interpret and explain them.
Here, DOD has asserted ambiguity where there is none. We explain the statute at DOD’s insistence, and DOD cannot be heard to complain that the very act of explanation which it demands is evidence of ambiguity. If it were so, every statute which a party requires the court to apply would be deemed ambiguous. See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 45.02 (4th ed. 1984).

. The majority concedes that the "common" understanding of "within retail sales outlets” might be physically within the walls of a store, as the Claims Court held. The majority then embarks on an exploration of subjective policy considerations, leaving us in suspense as to what other possible meaning the words could have. When the majority finally returns to the statutory language, it is with the ambivalent statement that ”‘[w]ithin retail sales outlets’ is not without some ambiguity.”

. Oklahoma v. Weinberger, 741 F.2d 290, 292 (10th Cir.1983), cert. denied, 466 U.S. 971, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984).

. Oklahoma v. Weinberger, 582 F.Supp. 293, 294-95 (W.D.Okla.1982), aff’d, 741 F.2d 290 (10th Cir.1983), cert. denied, 466 U.S. 971, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984).

. Oklahoma, 582 F.Supp. at 295 (quoting Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978)); see also Oklahoma, 741 F.2d at 292.

. The weakness in the Tenth Circuit’s reasoning is that the common meaning of the words does not lead to "absurd results” or "thwart the obvious purpose of the statute.” Indeed, the common meaning of the words must be used “‘where no such consequences would follow and where ... [the plain meaning] appears to be consonant with the purposes of the Act____ Trans Alaska, 436 U.S. at 643, 98 S.Ct. at 2061 (quoting Commissioner v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965)).

. 20 U.S.C. § 107d-3(d) (1982).

. Texas State Comm’n for the Blind v. United States, 6 Cl.Ct. 730, 738 (1984).

. WEBSTER’S THIRD NEW INTERNATIONAL DICTIONARY 2627 (1967). In Shakespeare’s time "within” could also mean "in the control of,” but this definition is obsolete. Id.

. It is significant to note that the case cited by DOD for this argument adopts the common meaning and defines the word "within” to mean "inside the bounds” and "not without.” Town of Alexandria v. Clark County, 231 S.W.2d 622, 624 (Mo.1950).

. Although "within” in that context connotes something other than physical space, it still means “inside the boundaries of’ or “contained in." DOD can offer no accepted synonym or use of the word that when read in context with “retail sales outlets” can lead to the result it desires.

. Ricker v. United States, 396 F.2d 454, 184 Ct.Cl. 402 (1968); 2A SUTHERLAND § 46.06 (1984); see also Hart v. United States, 585 F.2d 1025, 1035, 218 Ct.Cl. 212 (1978) ("People are entitled to find in the statute books the laws that govern them.”).

. United States v. John C. Grimberg Co., 702 F.2d 1362, 1366 (Fed.Cir.1983). The decision in Grimberg hinged on whether “claim” meant a claim filed with the Claims Court or a claim filed with the Government’s contracting officer. Grimberg held that the word "claim" had to be read in context, just as the word "within” must be read in context here. Certainly, Grimberg provides no support for the majority to change the meaning of the statute by deleting words from it.

. WEBSTER’S THIRD NEW INTERNATIONAL DICTIONARY 1602 (1967).

. Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370, 45 S.Ct. 274, 276, 69 L.Ed.2d 660 (1925) (“the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover” (quoting lower court opinion, 294 Fed. 194)); Benton v. United States, 488 F.2d 1017, 1020, 203 Ct.Cl. 263 (1973); Prudential Ins. Co. of America v. United States, 319 F.2d 161, 166, 162 Ct.Cl. 55 (1963).

. The reason for the distinction lies in the nature of the two departments. First, the veterans canteen service is specifically authorized under law and is a direct entity of the Federal Government. 38 U.S.C. § 4201 (1982). Second, the canteen system and the exchanges serve different customers and different ends. The legislative history shows that Congress was well aware of the veterans canteen services’ unique legal and factual status. Randolph-Sheppard Act for the Blind Amendments of 1973: Hearings on S. 2581 Before the Subcomm. on the Handicapped of the Senate Comm, on Labor and Public Welfare, 93d Cong., 1 Sess. 26 (1973) (hereinafter cited as 1973 Hearings).

. The majority departs from the path established by the Supreme Court:
"It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms. [Citations omitted.]
“Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion. [Citation omitted.] There is no ambiguity in the terms of this act. * * *
"Statutory words are uniformly presumed, unless the contrary appears, to be used in their ordinary and usual sense, and with the meaning commonly attributed to them. * * * ” Caminetti v. United States, 242 U.S. 470, 485-86, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); see Packard Motor Car Co. v. NLRB, 330 U.S. 485, 492, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); Selman v. United States, 498 F.2d 1354, 1356, 204 Ct.Cl. 675 (1974).

. Railroad Comm’n of Wisconsin v. Chicago, B. & Q. R.R., 257 U.S. 563, 589, 42 S.Ct. 232, 238, 66 L.Ed. 371 (1922) ("Such aids are only admissible to solve doubt and not to create it.’’); United States v. Hung Chen Fur Corp., 188 F.2d 577, 584, 38 CCPA 107 (1951).

. Kung Chen Fur, 188 F.2d at 585.

. The majority concedes that military bases are subject to the required priority for blind vendors. Thus, one or more blind vending stands must be established on every military base. See 20 U.S.C. §§ 107(b)(2), 107e(3) (1982). Congress expected to double the number of blind vendors in 5 years by removing obstacles to growth and requiring blind vending stands on “all Federal property.” (Emphasis supplied.) Randolph-Sheppard Act Amendments of 1974, Pub.L. No. 93-516, § 201, 1974 U.S.CODE CONG. & AD.NEWS 1868, 1869.

. S.REP. NO. 937, 93d Cong., 2d Sess. 10, 14-15 (1974).

. 1973 Hearings at 31.

. 20 U.S.C. §§ 107(b)(1), 107d-3 (1982).

. 20 U.S.C. § 107d-3(b)(l) (1982). The existing law in 1974 already required assignment of vending machine income where the machines were in direct competition with blind vendors. In 1974, there were no exemptions from income assignment; yet DOD had refused to assign income to the blind vendors, as required by law. Review of Vending Operations on Federally Controlled Property, Report to the Subcomm. on the Handicapped, Senate Comm, on Labor and Public Welfare, Comp.Gen.Rep. B-176886 at 27 (Sept. 27, 1973) (GAO Report); see Texas State, 6 CI.Ct. at 733 n. 6.
Thus, in the 1974 amendments. Congress found it necessary to direct the Secretary of HEW to "take such action and promulgate such regulations as he deems necessary to assure compliance” with income sharing. 20 U.S.C. § 107d-3(g) (1982).

. 20 U.S.C. § 107d-3(b)(l) (1982).

. The majority misplaces its reliance on Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892), where the Supreme Court adopted a restricted meaning of the word "labor” to include only "cheap, unskilled labor” and not to include preachers. The statute was intended to “remedy the evil” of unskilled immigrants who worked for low wages.
Here, the “evil” expressly includes the military exchanges’ use of vending machines to compete with blind vendors. Furthermore, the majority does not adopt a "restricted” meaning of the words “within retail sales outlets." By deleting the words, the majority expands the scope of the exemption. Holy Trinity is devoid of any support for this novel judicial legislation.

. 2Ó U.S.C. § 107(b)(1) (1982).

. S.REP. NO. 937 at 10-11, 17.

. Under the majority’s holding that military exchanges are wholly exempt from income sharing, the exchanges will continue to profit by competing directly with blind vendors and by blocking the placement of blind vending stands. The majority "thwarts the obvious purpose of the statute” to increase the number of blind vendors on military bases from 46 to 490 or more, by gutting the statute of its two strengths: (1) income sharing and (2) administration by HEW.

. Army Air Force Exchange System Randolph-Sheppard Act Compliance Manual, ESM 11-2, p. 2-1.

. GAO Report at 26; see Texas State, 6 Cl.Ct. at 733.

. Oversight of the Randolph-Sheppard Act, 1979: Hearings Before the Subcomm. on the Handicapped of the Senate Comm, on Labor and Human Resources, 96th Cong., 1st Sess. 93 (1979) (statement of Maj. Gen. Stanley M. Um-stead, Jr.) (1979 Oversight Hearings ).

. The Claims Court’s discussion of whether additional appropriated funds would be necessary to satisfy the judgment is relevant only to Claims Court jurisdiction, and not to the merits of the case. Texas State, 6 Cl.Ct. at 737. Although the majority characterizes this as "tortured” reasoning, the majority concedes that no additional appropriations are necessary to satisfy the judgment.

. Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942).

. Harrison v. PPG Indus., Inc., 446 U.S. 578, 592, 100 S.Ct. 1889, 1897, 64 L.Ed.2d 525 (1980).

. United States R.R. Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

. Albernaz v. United States, 450 U.S. 333, 342, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) (quoting United States R.R., 449 U.S. at 179, 101 S.Ct. at 461).
The majority implies that DOD had "no opportunity for input” to the Senate Committee because it did not appear at one meeting on January 19, 1974. The majority ignores the lengthy statement of Lt. Gen. Leo E. Benade, Deputy Assistant Secretary for Military Personnel Policy, Department of Defense, on November 19, 1973, before the subcommittee. DOD repeatedly expressed its concern for the impact of the Randolph-Sheppard Act on the military exchange system, with particular emphasis on vending machines. DOD warned the subcommittee that "[t]he proposed changes to the Randolph-Sheppard Act would reduce [the military exchanges’ income from vending machines] by as much as $20 million each year” (out of a total income of $66 million/year). 1973 Hearings at 98-103.
DOD’s estimate of the impact on military exchanges turned out to be an overstatement. At the 1979 Oversight Hearings, DOD admitted that it would be liable for only $4.4 million in income sharing under the statute out of $120 million received by the exchanges annually. 1979 Oversight Hearings at 93.
The majority’s cry that the statute tolls the death knell for the military exchanges is simply untrue, since the exchanges are subject to sharing less than 4 percent of their income. It cannot be said that Congress was unaware of the consequences of its act, since it was warned of consequences far more severe than would actually result from applying the statute. Congress was fully aware of the military exchanges’ use of vending machines income, both from Lt. Gen. Benade’s statement and from GAO’s thorough investigation of DOD.

. See 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 51.03 (4th ed. 1984).

. Aldridge v. Williams, 3 How 9, 24, 44 U.S. 9, 24, 11 L.Ed. 469 (1845).

. Wisconsin R.R. Comm’n, 257 U.S. at 589, 42 S.Ct. at 237.

. Pennsylvania R.R. v. International Coal Mining Co., 230 U.S. 184, 199, 33 S.Ct. 893, 897, 57 L.Ed. 1446 (1913).

. Wisconsin R.R. Comm’n, 257 U.S. at 589, 42 S.Ct. at 238.

. Friedman v. United States, 310 F.2d 381, 159 Ct.Cl. 1 (1962), cert. denied, Lipp v. United States, 373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963):
“* * * The earlier colloquy at the hearings involving Congressmen Doyle and Clements— on which reliance has been placed * * *—can be said to represent only their own views and not the position of the subcommittee, or the full committee, let alone of the House or the Senate as a whole." 310 F.2d at 405.

. Aldridge, 44 U.S. at 24.

. Northern Colo. Water Conservancy Dist. v. Federal Energy Regulatory Comm’n, 730 F.2d 1509, 1518 (D.C.Cir.1984) (quoting Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979)). See also General Elec. Co. v. United States, 610 F.2d 730, 734, 221 Ct.Cl. 771 (1979).

. Hart, 585 F.2d at 1035.

. W. Moorhead, A Congressman Looks at the Planned Colloquy and Its Effect in the Interpretation of Statutes, reprinted in 3 C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION 639 (4th ed. 1973).

. Hart, 285 F.2d at 1035.

. 120 CONG.REC. 35,712 (1974).

. Id. Also, the remarks were made after the Senate voted. See Texas State, 6 Cl.Ct. at 741. Although both houses voted again over 1 month later to override the veto, it is not realistic to assume that Congress even considered this bit of colloquy, grown stale in the record, over the words in the bill itself. “Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended.” Hart, 585 F.2d at 1035.

. W. Moorhead, reprinted in 3 C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION at 639.

. W. Gilbert, H.M.S. Pinafore, Act II (1878), quotation reprinted in J. Bartlett, Familiar Quotations 623 (11th ed. 1937).

. Ricker v. United States, 396 F.2d 454, 456, 184 Ct.Cl. 402 (1968) (quoting 62 Cases, More or Less Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951).

. Ricker, 396 F.2d at 456.

. Id.

. Id.

. 20 U.S.C. § 107d-3(b) (1982).

. See 2k N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 48.16.

. Badeau v. United States, 21 Ct.Cl. 48, 49-50 (1886); see United States v. Philadelphia Natl Bank, 374 U.S. 321, 348-49, 83 S.Ct. 1715, 1733-34, 10 L.Ed.2d 915 (1963); Waterman S.S. Corp. v. United States, 381 U.S. 252, 268-69, 85 S.Ct. 1389, 1398, 14 L.Ed.2d 370 (1965). See also Key Buick Co. v. Commissioner, 68 T.C. 178, 183 (1977), aff’d, 613 F.2d 1306 (5th Cir.1980).

. 1979 Oversight Hearings at 93. The majority also discounts the testimony and letters from the GAO in connection with the 1979 Oversight Hearings, in which GAO found that the DOD regulation was inconsistent with the statute as well as with the authorized HEW regulations. Finally, the majority reverses the well-reasoned decisions of the arbitration panel and of the Claims Court.

. See Texas State, 6 Cl.Ct. at 733 n. 6.

. S.REP. NO. 937, 93d Cong., 2d Sess. at 16, 19 (1974).

. 20 U.S.C. § 107(b) (1982). The functions under the Randolph-Sheppard Act which were administered by the Secretary of HEW are now administered by the Secretary of Education. 20 U.S.C. § 3441 (1982). For the purposes of this opinion, I will continue to refer to HEW because the regulations in question were promulgated by HEW rather than by Education.

. 20 U.S.C. § 107(b) (1982).

. Id.

. 20 U.S.C. § 107a(a) (1982). The only other reference to DOD in the act is that "Federal property" is defined to include DOD property. 20 U.S.C. § 107e(3) (1982). DOD is not "charged with enforcing” the act. Actually, DOD is not given any authority whatsoever under the act. Cf. United States v. Riverside Bayview Homes, Inc., — U.S.-, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).

. 20 U.S.C. §§ 107d-l, 107d-2 (1982).

. 20 U.S.C. § 107d-3(g).

. Exec. Order No. 12,146, 3 C.F.R. 409 (1980).

. See, e.g., 38 Op.Att’y Gen. 149 (1934); 37 Op.Att’y Gen. 34 (1932); 32 Op.Att'y Gen. 472 (1921).

. Oklahoma, 741 F.2d at 293.

. See Northern Colo., 730 F.2d at 1517.

. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 863-64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984).

. 43 Fed.Reg. 25,337-42. DOD’s actions are inconsistent with its argument of ambiguity. Query: If the statute contained any support for DOD’s interpretation, why was DOD so vigorous in attempting to change the statute and the HEW regulation which tracked the statute? Why did DOD promulgate its own regulation instead of simply withholding the income under the statute and the HEW regulation as written?

. Id. at 25,339.

. The majority misplaces its reliance on Riverside Bayview Homes, 106 S.Ct. at 461, since Congress charged HEW and not DOD with enforcing the statute. Thus, it is HEW’s regulation which is entitled to deference.